# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| ASSURED HEALTH GROUP LLC, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| JAMES OSWALD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTERS FOR MEDICARE AND | ) | Case No.: _____ |
| MEDICAID SERVICES, | ) | |
| | ) | |
| CHIQUITA BROOKS-LASURE, in her | ) | |
| capacity as Administrator of the Centers for | ) | |
| Medicare and Medicaid Services, | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| XAVIER BECERRA, in his official capacity as | ) | |
| Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Assured Health Group LLC and James Oswald ("Plaintiffs") bring this civil action

against the above-listed Defendants for declaratory and injunctive relief and allege:

### INTRODUCTION

1.     One of the core provisions of the Affordable Care Act ("ACA") is the requirement

that the Secretary ("Secretary") of Health and Human Services ("HHS") "establish procedures

under which a State may allow agents or brokers . . . to enroll individuals and employers in any

qualified health plans . . . offered through an Exchange" and "to assist individuals in applying for premium tax credits and cost-sharing reductions for plans sold through an Exchange." 42 U.S.C. § 18032(e). As explained by the Centers for Medicare and Medicaid Services ("CMS"), the HHS component that oversees the administration of exchanges under the Affordable Care Act ("Exchanges"):

> The primary goal of the Patient Protection and Affordable Care Act (Affordable Care Act) is to broaden access to health insurance coverage. To achieve this goal, the Affordable Care Act provides a premium tax credit to help subsidize coverage, gives consumers tools to make informed choices about their health care coverage, and puts in place strong consumer protections. Agents and brokers play an integral role in helping individuals understand and act on the coverage protections that the Affordable Care Act offers.

*Welcome to the Affordable Care Act Basics Module*, CMS, 2 (2021), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/affordable%20care%20act%20basics_112.pdf.

2.      James Oswald is one such agent. Oswald is licensed in 29 states to sell insurance. Since 2018, he has been a party to Federally-Facilitated Exchange ("FFE") Registration and Agreements that authorize him to enroll consumers in ACA plans through state and federally operated insurance exchanges.

3.      During his work as an agent authorized to enroll consumers in ACA plans through the FFE, Oswald's employer, Assured Health Group, LLC ("AHG"), relied on his National Producer Number ("NPN"), which was used—as permitted by CMS—by various writing agents to enroll over 80,000 people in ACA coverage who remained enrolled in their health plans as of July 2024.  The effort generated over $2 million in estimated commission revenue for AHG in that month alone—and, while the number of consumers associated with Oswald's NPN who remained in their plans, as well as the commission revenue tied to their enrollments, has decreased since

July, the remaining enrollments continued to generate, on average, close to $2 million per month in estimated commissions.

4.      Despite never once having trouble with any state insurance department or CMS, CMS sent a suspension letter to Oswald on June 21, 2024, pursuant to 45 C.F.R. § 155.220(g)(5)(i)(A) that stated that it had "preliminarily determined that you have enrolled multiple consumers in coverage and/or switched their health plans through the Exchanges without their (or their authorized representatives') knowledge or consent, resulting in a number of Exchange policy cancellations."  The letter further stated that Oswald's FFE agreements were suspended "based on CMS's "reasonable suspicion that you may have engaged in fraud, or abusive conduct that may have caused imminent or ongoing consumer harm using the personally identifying information (PII) of an Exchange enrollee or applicant or in connection with an Exchange enrollment or application, as detailed in the Attachment."  An attachment to the letter identified five consumers that were allegedly the basis for this suspicion.

5.      Oswald promptly submitted the signed written consent forms that showed that all five consumers consented in writing to have AHG act on their behalf with respect to the identified Exchange enrollments.

6.      Nevertheless, CMS notified Oswald on August 9, 2024, that his FFE Agreements were terminated immediately, and that CMS proposed denying Oswald the ability to enter into new FFE Agreements for three years. CMS stated that it "was not persuaded" by the signed, written consent forms.

7.      Through counsel, Oswald submitted a timely request for reconsideration on September 5, 2024, that contained a sworn declaration, background on Oswald and AHG,

information concerning AHG's training and compliance programs, and evidence directly refuting the vague and ambiguous allegations made in the suspension and termination letters.

8.      Despite the overwhelming evidence of consent and proper conduct on the part of Oswald, AHG, and the writing agents on the five enrollments referenced in the suspension letter, CMS made a final determination upholding the three-year termination via a letter to Oswald dated November 1, 2024.

9.      CMS's arbitrary and baseless termination has harmed Oswald's reputation, puts his State licenses in immediate jeopardy, and threatens to deprive Oswald of his chosen livelihood.  It also has cost AHG commission revenue, threatens to ultimately deprive AHG of as much as tens of millions of dollars in such revenue, and has harmed AHG's ability to effectively help consumers associated with Oswald's NPN with respect to their future health plan decisions.

10.      The termination violates the Administrative Procedure Act ("APA") and the Due Process Clause of the United States Constitution.

11.      Oswald and AHG have brought this case to secure injunctive and declaratory relief to set aside CMS's termination of Oswald's FFE Agreements.

**PARTIES**

12.      Plaintiff James Oswald is an individual residing at in Stuart, Florida.  He has been the National Sales Director of AHG since at least August 2022.  As the National Sales Director, Oswald manages a large and dynamic sales organization consisting of hundreds of licensed insurance producers, including many employees who assist with or facilitate consumer health insurance enrollments through the Exchanges.  Oswald generally does not personally assist with or facilitate the consumer health insurance enrollments through the Exchanges.

13.     Plaintiff Assured Health Group LLC is a limited liability company formed under Florida law with its principal place of business in West Palm Beach, Florida.  AHG is located at 500 Columbia Drive, Ste. 102, West Palm Beach, Florida, 33409.  AHG assists consumers across the nation in comparing and enrolling in affordable health insurance plans offered by approximately 13 insurance companies.

14.     Defendant CMS is an administrative agency within HHS that is headquartered in Baltimore County, MD, and oversees the operations of the ACA marketplaces. It is located at 7500 Security Boulevard, Baltimore, MD 21244.

15.     Defendant Chiquita Brooks-LaSure is the CMS Administrator. She administers CMS on behalf of the Secretary. She is sued in her official capacity. The office of the CMS Administrator is located at 7500 Security Boulevard, Baltimore, MD 21244.

16.     Defendant HHS is an executive department of the United States Government headquartered in Washington, D.C., and responsible for CMS. It is located at 200 Independence Avenue SW, Washington, DC 20201.

17.     Defendant Xavier Becerra is the Secretary of Health and Human Services. He oversees, among other things, CMS. He is sued in his official capacity. The office of the Secretary is located at 200 Independence Avenue SW, Washington, DC 20201.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701–06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and its inherent equitable powers.

19.     The denial of the request to reconsider the termination of Oswald's FFE Agreements constitutes a final agency action that is judicially reviewable under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 704, 706.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because the Defendants are either (1) United States agencies or (2) employees of the United States or a United States agency acting in their official capacity and a substantial part of the events or omissions giving rise to the Complaint occurred within this judicial district. In addition, the Plaintiffs reside in this district and no real property is involved in this action.

## BACKGROUND

### I.     The Affordable Care Act

21.     The ACA is intended to make health insurance more accessible through the creation of a marketplace that allows people to compare and purchase health insurance plans. The ACA marketplace includes a Federal Exchange, accessible at healthcare.gov, and State-based Exchanges. Both allow consumers to compare and purchase qualified health plans eligible for tax credits that subsidize consumer healthcare costs.

22.     As part of the ACA's mandate, HHS allowed private entities, known as "direct enrollment" or "enhanced direct enrollment" entities, to create their own web-based platforms to allow consumers, agents, and brokers to access the ACA exchanges. *See Direct Enrollment and Enhanced Direct Enrollment*, CMS, https://www.cms.gov/marketplace/agents-brokers/direct-enrollment-partners (last visited Nov. 15, 2024).  A "direct enrollment" entity ("DEE") is one that is permitted to create a platform that sends a user to healthcare.gov to complete the user's application, while an "enhanced direct enrollment" entity ("EDEE") can directly access CMS data, which dispenses with the need to send users to healthcare.gov.  *Id.*  Agents and brokers use these

DEEs and EDEEs to help match consumers with health plans that best meet their needs and enroll them in a plan if there is an appropriate fit for the consumer.

23.     CMS, an arm of HHS, has oversight responsibilities with respect to the exchanges, and HHS and CMS promulgate rules and regulations relating to it.  Specifically, Section 1312(e) of the ACA requires the Secretary of HHS to "establish procedures under which a State may allow agents or brokers—(1) to enroll individuals and employers in any qualified health plans in the individual or small group market as soon as the plan is offered through an Exchange in the State; and (2) to assist individuals in applying for premium tax credits and cost-sharing reductions for plans sold through an Exchange."  42 U.S.C. § 18032(e).  As part of this mandate, HHS and CMS have established requirements for agents and brokers who assist consumers on the Exchanges.  *See* 45 C.F.R. § 155.220.  These requirements include executing a general agent/broker agreement for FFEs and State-based Exchanges on the federal platform, as well as individual and small business health options program privacy and security agreements (as applicable), with CMS.  *See* 45 C.F.R. §§ 155.220(d), 155.260(b).  Additionally, agents and brokers must comply with standards of conduct set forth in the relevant regulations, are prohibited from engaging in fraud or abusive conduct, and must obtain consent to act on the consumer's behalf with respect to interactions with the Exchanges—including consent for any enrollment in a health plan.  *See* 45 C.F.R. §§ 155.220(g)(5)(i)(A), 155.220(j)(2), 155.227.

24.     CMS also has enforcement authority as part of its oversight responsibilities under the ACA and relevant regulations.  *See* 45 C.F.R. §§ 155.220(g)(5)(i)(A), 155.220(j)(2), 155.227. It may temporarily suspend an agent's or broker's agreements for up to 90 days if it, among other things, "reasonably suspects that an agent, broker, or web-broker may have engaged in fraud or in abusive conduct that may cause imminent or ongoing consumer harm using personally identifiable

information of an Exchange enrollee or applicant or in connection with an Exchange enrollment or application[.]" 45 C.F.R. § 155.220(g)(5)(i)(A).  The suspension is effective starting on the date of the notice sent to the agent or broker, *id.*, and the agent or broker may rebut CMS's allegations during the 90-day suspension period.  45 C.F.R. § 155.220(g)(5)(i)(B).  If the agent or broker submits rebuttal evidence, CMS must review it and decide whether to lift the suspension within 45 calendar days of receipt of the evidence.  *See id.*

25.     If after considering any rebuttal evidence, CMS makes a finding that the agent or broker engaged in fraud or abusive conduct that might cause imminent or ongoing consumer harm and that the conduct is "sufficiently severe", it may terminate the agent's or broker's agreement for cause.  45 C.F.R. §§ 155.220(g)(1), (g)(5)(i)(B).   A terminated agent or broker may request reconsideration of the termination decision within 30 calendar days of the written notice of termination from CMS, and CMS must provide written notice of the reconsideration decision within 60 calendar days of the date that CMS received the request for reconsideration.  *See* 45 C.F.R.  §§  155.220(h)(1)–(h)(3).   The reconsideration decision constitutes CMS's final determination with respect to the matter.  *See* 45 C.F.R. § 155.220(h)(3).

## II.     AHG's Compliance Program

26.     AHG invests substantial resources in its compliance infrastructure.  [Ex. I at I2–I3,[1] ¶ 7 (Oswald Nov. 15 Decl.); Ex. A at A8 (Sept. 5 Ltr. and attached Sept. 4 Oswald Decl.), ¶ 9].  The licensed agents and brokers who work for AHG and who are supervised by Oswald are trained to follow the ACA and related regulations, including the requirement that agents and brokers must secure acknowledgements and consents from consumers using AHG's services to access coverage

---

[1] For the Court's ease of reference, citations to Plaintiffs' exhibits are indicated by [Exhibit][Page Number].  The relevant page numbers can be found on each page of the exhibits at the bottom right-hand corner of the page.

through the Exchanges—and AHG and Oswald insist that everyone employed by AHG follow all applicable laws and regulations.  [Ex. I at I2, ¶ 6; Ex. A at A8, ¶ 6].  Additionally, AHG employs more than 10 full-time employees in its Quality Assurance ("QA") Department.  [Ex. I at I2–I3, ¶ 7; Ex. A at A8, ¶ 10].  Two managers direct the activities of AHG's quality assurance professionals—people employed for the purpose of ensuring that AHG is operating in compliance with state and federal laws and regulations.  [Ex. I at I2–I3, ¶ 7; Ex. A at A8, ¶ 11].  As demonstrated by the QA Department Guidelines that are provided to Department employees, QA Department personnel have a daily quota of calls that they must monitor for compliance.  [Ex. I at I3, ¶ 8; Ex. A at A8, ¶ 12; Ex. A at A12–A20].  The volume of calls being monitored by the QA Department changes over time, but is currently approximately 20% of the total call volume received by AHG employees.  [Ex. I at I3, ¶ 8; Ex. A at A8, ¶ 13].  QA representatives are specifically tasked with identifying and reporting violators to AHG management.  [Ex. I at I3, ¶ 9; Ex. A at A9, ¶ 14].  Violations of AHG's compliance guidelines include failure to complete ACA verifications and failure to follow CMS Guidelines, which are made available to all AHG agents.  [Ex. I at I3, ¶ 9; Ex. A at A8, ¶ 15, A22].  Not surprisingly, neither AHG nor Oswald have ever been fined or sanctioned by CMS or any insurance department.  [Ex. I at I3, ¶ 10; Ex. A at A8, ¶ 8].

### CMS'S UNLAWFUL TERMINATION OF OSWALD'S EXCHANGE REGISTRATION AND AGREEMENTS

### I.    The Suspension

27.    The licensed agents and brokers employed by AHG use the web-based platform of HealthSherpa, an EDEE, to access CMS data and help enroll consumers in ACA health insurance marketplace plans.  [Ex. I at I3, ¶ 11; Ex. A at A4–A6].  AHG writing agents have historically used Oswald's NPN when submitting Exchange policies through HealthSherpa by way of its "NPN

Override" feature, [Ex. I at I3, ¶ 12; Ex. A at A4], a practice permitted by CMS.  [*See* Ex. B at B1–B3 (July 3, 2024 CMS FAQs); *see also* Ex. C at C26 (Sept. 26, 2024 CMS Preparing for Plan Yar (PY) 2025 Open Enrollment)].  As of July 2024, writing agents had used Oswald's NPN to process approximately 80,000 enrollments that remained active and that have generated over $2 million in commission payments in that month alone.

28.     From August 2023 through December 2023, AHG helped five consumers (Consumers A, B, C, D, and E) from Mississippi, Alabama, Ohio, and Indiana enroll in health plans offered on the Exchanges.  [Ex. I at I4, ¶ 14; Ex. A at A27–A52].  Oswald's NPN was used with respect to each of the five enrollments [Ex. I at I4, ¶ 16; Ex. A at A53–A60]; however, Oswald did not act as the writing agent or interact with any of the five consumers concerning the policies in which they were enrolled.  [Ex. I at I4, ¶ 16; Ex. A at A9–A10, ¶¶ 21–30, A53–A60].  Instead, the following writing agents interacted with and assisted the relevant consumers with the enrollments: (1) Rolando Loretto for Consumers A and B; (2) Manuel Ogando for Consumers C and D; and (3) Noslen Gonzalez for Consumer E.  [Ex. I at I4, ¶ 16; Ex. A at A9–A10, ¶¶ 25–30].  The writing agents used their personal HealthSherpa log-in credentials with respect to these consumer applications and enrollments [Ex. I at I4, ¶ 16; Ex. A at A53–A60], and the consumers reviewed and signed consent forms in which they acknowledged that all required and appropriate disclosures were provided to them and gave consent for AHG to act on their behalf with respect to their Exchange enrollments.  [Ex. I at I4, ¶ 16; Ex. A at A9, ¶¶ 17–20; Ex. D at D6–D11 (Sept. 27 Ltr. and attached Sept. 27 Oswald Supp. Decl.)].

29.     On June 21, 2024, CMS sent Oswald a suspension letter pursuant to 45 C.F.R. § 155.220(g)(5)(i)(A) that stated that it had "preliminarily determined that you have enrolled multiple consumers in coverage and/or switched their health plans through the Exchanges without

their (or their authorized representatives') knowledge or consent, resulting in a number of Exchange policy cancellations." [Ex. I at I4–I5, ¶¶ 16–17; Ex. E at E2 (June 21 Ltr.)]. The letter further stated that Oswald's Plan Year ("PY") 2024 agreements were suspended "based on our reasonable suspicion that you may have engaged in fraud, or abusive conduct that may have caused imminent or ongoing consumer harm using the personally identifying information (PII) of an Exchange enrollee or applicant or in connection with an Exchange enrollment or application, as detailed in the Attachment." [Ex. I at I4–I5, ¶¶ 16–17; Ex. E at E2]. The Attachment explained that:

> Your Exchange User ID was used to submit multiple PY 2023 and/or PY 2024 policies that were subsequently cancelled due to suspected fraud. More specifically, CMS reasonably suspects you enrolled multiple consumers in coverage and/or switched their health plans through the Exchange without their (or their authorized representatives') knowledge or consent. The policies listed below are representative examples (and thus do not represent the entire universe) of our findings and support our determination to suspend your PY 2024 Agreements.

[Ex. E at E5]. The Attachment identified the five consumers from Mississippi, Alabama, Ohio, and Indiana who are referenced above, as Consumers A. B, C, D, and E, and listed information relating to their enrollment applications. [Ex. I at I4–I5, ¶ 17; Ex. E at E5] The suspension letter provided no additional details concerning the allegations against Oswald—and nothing whatsoever about any other purportedly problematic submissions that would constitute the rest of the "entire universe" of potential issues vaguely referenced in the letter. [*See generally*, Ex. I at I4–I5, ¶ 17; Ex. E at E5].

## II.    Oswald's Response

30.    On June 25, 2024, prior to engaging counsel, Oswald provided rebuttal evidence to CMS by e-mail in response to the suspension letter. [Ex. I at I5, ¶ 18; Ex. F (June 25 E-mail)]. Specifically, Oswald submitted the five signed written consent forms showing that the five

identified consumers acknowledged all required and appropriate disclosures and confirmed that each consumer consented to have AHG act on their behalf with respect to the identified Exchange enrollments.  [Ex. I at I5, ¶ 18; Ex. F].

### III.    CMS's Termination

31.    On August 9, 2024, CMS sent Oswald a letter notifying him of the immediate termination of his PY 2024 Exchange Agreements and advanced notice of the proposed denial of his right to enter into Exchange Agreements for three years—until August 9, 2027.  [Ex. I at I5, ¶ 19; Ex. G at G2 (Aug. 9 Ltr.)].   In the letter, CMS noted that Oswald had submitted rebuttal evidence, stated that it reviewed the materials, and explained that it "was not persuaded to lift [his] suspension."  [Ex. I at I5, ¶ 19; Ex. G at G2]  CMS further stated that:

> [T]he consumers who were interviewed after we reviewed your evidence told us
> that inaccurate information was entered by you on their eligibility application
> and/or that they were enrolled without consent, in violation of 45 C.F.R.
> §155.220(j)(2)(ii) and (iii), respectively.  For these specific violations, Consumer
> B stated she did not know you or consent to an Exchange enrollment, and indicated
> she had Medicaid coverage at the time of the Exchange enrollment.  Consumer D
> stated he consented to an Exchange enrollment based on his understanding from
> you that he qualified for an advanced premium tax credit (APTC) despite having
> no income.  He found out after his enrollment that this was untrue.  Consumer E
> stated she did not know you or consent to an Exchange enrollment.  Accordingly,
> we determined that the evidence you submitted in rebuttal does not persuade us to
> lift the suspension.

[Ex. G at G2]  The letter said nothing else regarding: (1) the context in which these statements were made, including the questions the consumers were asked, follow-up questions, and other statements they made to CMS; (2) additional evidence, if any, CMS relied on in its assessment; (3) the evidentiary standard CMS used to assess the evidence; (4) the applications for Consumers A and C, which were identified as potentially problematic—without supporting evidence—in the suspension letter; and (5) any other application that made up the "entire universe" of potentially problematic applications.  [*See generally, id.*]

**IV.     Oswald's Request for Reconsideration and Supplemental Submission**

32.     On September 5, 2024, Oswald, through counsel, submitted a timely request for reconsideration of the termination decision.  [Ex. I at I5, ¶ 20; *see generally* Ex. A].  Because CMS's June 21 suspension letter contained nothing more than conjecture with respect to the allegations of wrongdoing, this letter response represented Oswald's first real opportunity to respond to the allegations against him.  The September 5 Letter and attached evidence, including Oswald's sworn declaration, provided, among other things, background on Oswald and AHG, information concerning AHG's training and compliance programs, and evidence directly refuting the vague and ambiguous allegations made in the suspension and termination letters regarding the five consumers.  [Ex. I at I5, ¶ 20; *see generally* Ex. A].

33.     The submission and evidence directly contradicted the general statements of Consumers B, D, and E—statements that represented the only specific evidence purportedly supporting CMS's allegations.  [Ex. I at I5, ¶ 20; *see generally* Ex. A].  For example, Oswald provided evidence that established beyond any doubt that he never interacted with the five consumers, that identified licensed agents acted as the writing agents for the relevant applications, and that each of the five consumers had signed and executed consent forms acknowledging all required and appropriate disclosures (including, but not limited to, the terms and requirements of the APTC), and confirmed that each of the five identified consumers provided signed written consent for AHG to act on their behalf with respect to the identified Exchange enrollments.  [Ex. I at I5–I6, ¶ 21; Ex. A at A9–A10, ¶¶ 25–30, A28–A52, A54–A60].  This evidence included Consumers A's, B's, C's, D's, and E's signed written acknowledgement of disclosures and consent to have AHG act on their behalf, as well as HealthSherpa records that established that others—not Oswald—acted as the writing agent for, and interacted with, the five relevant consumers.  [Ex. I at

13

I5–I6, ¶ 21; Ex. A at A9–A10, ¶¶ 25–30, A28–A52, A54–A60].  In addition, Oswald submitted evidence that Consumer B remained enrolled in the same policy she claimed she was enrolled in without her consent, bringing into question her claim that she was covered by Medicaid at the time of the enrollment and whether she recalled the relevant details concerning consent.  [Ex. I at I5–I6, ¶ 22; Ex. A at A9, ¶ 27, A62].

34.     On September 27, 2024, Oswald provided additional evidence from AHG's online document signing application, signature.io, in support of his September 5 request for reconsideration.  [Ex. I at I6, ¶ 23; Ex. D at D6–D11 (Sept. 27 Ltr.)].  As explained in the September 27 letter, this application generated an SMS text message with a link for the relevant consumers to access the acknowledgement and consent forms previously submitted to CMS by Oswald in response to the June 21 suspension letter, and that the five identified consumers signed the acknowledgement and consent forms.  [Ex. I at I6, ¶ 23; Ex. D at D1–D2].  The documents attached to the letter were date- and time-stamped records reflecting the electronic communication trail for the five consumer interactions identified by CMS.  [Ex. I at I6, ¶ 23; Ex. D at D4, ¶¶ 2–3, D6–D11].  Each electronic trail noted when the acknowledgement and consent forms were sent by SMS text to the consumers, when the documents were viewed by the consumers, when the consumers verified their mobile phone numbers, when the consumers signed the acknowledgement and consent forms, and when the signed documents were sent back to AHG.  [Ex. I at I6, ¶ 23; Ex. D at D4, ¶¶ 2–3, D6–D11].

## V.     CMS's Issues its Final Determination

35.     On November 1, 2024, CMS denied Oswald's request for reconsideration of the termination.  [Ex. I at I6, ¶ 24; *see generally* Ex. H (Nov. 1 Ltr.)].  It referenced generally the evidence Oswald submitted, noted that it did not consider the evidence submitted with the

September 27 Letter because it was received after the 30-day reconsideration request deadline, and stated that CMS "was not persuaded to lift your termination[.]"  [Ex. H at H3].  While somewhat unclear, CMS appears to have cited two bases for the denial.  First, it stated that Oswald's Exchange User ID credentials "were associated" with the five consumer enrollments at issue and "[a]llowing another agent to use your login credentials would constitute a violation of the [Agent/Broker] General Agreement][.]"  [*Id.* (emphasis added).].  CMS did not state in the denial letter or in any other communication with Oswald what specific evidence supports its bald, vague assertion that Oswald's Exchange User ID credentials "were associated" with these five consumer applications—let alone how (or whether) evidence of such an association provided a sufficient basis for CMS to make a finding that Oswald allowed someone else to use his credentials.[2] Second, CMS stated without explanation that the signed acknowledgement and consent forms submitted by Oswald to rebut CMS's allegations were insufficient to overcome the consumer interview statements paraphrased in CMS's termination letter.  [Ex. H at H2].

### CMS'S UNLAWFUL ACTIONS VIOLATED THE APA AND WARRANT EQUITABLE RELIEF

I.      **CMS's Termination of Oswald was Unwarranted by the Facts and is Subject to Trial *De Novo* by This Court.**

36.      In certain circumstances, a court reviewing agency action may engage in a *de novo* review of the action and set it aside if it was "unwarranted by the facts."  5 U.S.C. § 706(2)(F); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971).  Under Section 706(2)(F), "de novo review of whether the [Administration's decisions] were 'unwarranted by the facts' is authorized … in only two limited circumstances': (1) 'when the action is adjudicatory in

---

[2] Contrary to CMS's bald, unsupported assertion in this regard, Oswald never provided his Exchange User ID credentials to anyone to use with respect to these enrollments, nor did he use these credentials prior to receiving the June 21 suspension letter (and then only to review one file).  [Ex. I at I4, ¶¶ 14–15].

nature and the agency factfinding procedures are inadequate' and (2) 'when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.'"  *Bajjani v. U.S. Small Business Admin.*, 824 Fed. App'x 725, 735 (11th Cir. Aug. 13, 2020) (quoting *Overton Park*, 401 U.S. at 415).  With respect to the first circumstance, "*[d]e novo* review is appropriate only where the underlying [factfinding] procedures are inadequate to the extent that they are deemed 'severely defective.'"  *OKKO Business PE v. Lew*, 133 F. Supp.3d 17, 28 (D. D.C. 2015).

37.     Here, there can be no question that CMS's decision to suspend and terminate Oswald's Exchange agreements was "adjudicatory in nature."  5 U.S.C. § 706(2)(F).  It was supposed to involve a factfinding process that included obtaining and submitting evidence, opportunities to respond, and an assessment of the evidence presented in the matter, as well as a case-specific determination that Oswald engaged in fraud or abusive conduct that was "sufficiently severe" to warrant the termination of his Exchange agreements.  45 C.F.R. §§ 155.220(g)(1), (g)(5)(i)(B), (h)(1)-(h)(3); *see also ITServe All., Inc. v. United States Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (holding that adjudication involves both (1) "case specific determinations" and  (2) "immediately binds parties by retroactively applying law to their past actions") (internal citations omitted) (cleaned up)).

38.     Additionally, the facts here establish that CMS's factfinding procedures were "severely defective" such that this Court should perform *de novo* review.  First, CMS never disclosed to Oswald, among other things: (1) "the entire universe . . . of our findings" supporting its reasonable suspicion that Oswald may have engaged in fraud or abusive conduct as set forth in its June 21, 2024, suspension letter—just what it deemed to be five "representative examples", [Ex. E5]; (2) the entire interviews of Consumers B, D, and E, including whether they were

confronted with their signed acknowledgement and consent forms; and (3) any evidence supporting the fact that Oswald's Exchange User ID credentials were used to enroll any of the identified consumers in ACA health plans.  [Ex. G2; Ex. H2].  This prevented Oswald from any real opportunity to respond to CMS's allegations and address CMS's concerns—to the extent any of the evidence set forth above even existed.  Second, CMS refused to consider the signature.io evidence Oswald submitted with his September 27, 2024, letter—despite the fact that there is no regulatory prohibition on submitting additional evidence *after* an agent or broker has made a timely request for reconsideration.  *See* 45 C.F.R. §§ 155.220(h)(2) (stating only that "[t]he agent, broker, or web-broker must submit a request for reconsideration to the CMS Administrator within 30 calendar days of the written notice from HHS").  Third, CMS clearly did not apply any recognized evidentiary standard to its assessment of the evidence here—and, importantly, never disclosed any such standard in its regulation or to Oswald.  [Exs. E, G, H].  All of these facts, taken together, establish that CMS's factfinding procedures are "severely defective" such that they require *de novo* by this Court.

## II.     CMS's Termination of Oswald Violated Its Own Regulations.

39.     The APA states that agency action that is "not in accordance with the law" or that is "without observance of procedure required by law" must be deemed "unlawful or set aside" by courts.  5 U.S.C. §§ 706(2)(A), (D).  While HHS regulations set out a procedure for termination, CMS did not follow it here.  Specifically, CMS may only terminate an agent or broker's Exchange agreements for cause after it makes "a specific finding of noncompliance or pattern of noncompliance" that is "sufficiently severe" to warrant this harsh sanction.  45 U.S.C. § 155.220(g)(1).  A finding of noncompliance can be based on fraud or abusive conduct that may cause imminent or ongoing consumer harm, 45 U.S.C. § 155.220(g)(5), or based on a violation of

(1) a standard of conduct set forth in the regulation; (2) a term or condition of an Exchange agreement; or (3) Federal or State law.  45 U.S.C. § 155.220(g)(2).

40.     Here, CMS made no specific finding of fraud or abusive conduct to support its termination—let alone conduct that is "sufficiently severe" to terminate Oswald's agreements and ban him from the ACA system for three years.  In its four-page August 9 termination letter, CMS committed **only one paragraph** to discussing the evidence and its conclusion—and did not set forth any meaningful assessment of the evidence or any clear finding based on it.  CMS merely stated that it reviewed the rebuttal evidence submitted by Oswald—which consisted of the signed written acknowledgements and consents for the five consumers identified in the suspension letter [Ex. E at E3–E4]—cited newly-obtained statements made in CMS interviews by three of those consumers that they either did not consent to the enrollment or, in one case, consented because the consumer was provided with incorrect information concerning the APTC; and noted in conclusory fashion that CMS had "determined that the evidence you submitted in rebuttal does not persuade us to lift the suspension."  *Id.*

41.     While CMS appears to have rejected Oswald's request because it deemed his evidence insufficient to establish consent, it did not explain why this was the case, nor did it make a finding in any of its letters as to what specific conduct Oswald engaged in that violated his obligation to obtain consent[3] or how this mysterious conduct was "sufficiently severe" to warrant the termination.  CMS's conclusory assertions, refusal to explain its assessment of the evidence, and failure to make a clear finding in these regards fails to meet the requirements of CMS's own

---

[3] CMS failed to properly consider the unrefuted evidence presented by Oswald that he never interacted with these five consumers and was not directly involved in the relevant enrollments—which is consistent with the interview statements made to CMS by Consumers B and E—and CMS made no finding in these regards.

regulations, which do not authorize unexplained and unsupported terminations devoid of findings of cause and conduct "sufficiently severe" to warrant termination.

### III.     CMS's Termination of Oswald is Arbitrary and Capricious.

42.     Oswald's termination is arbitrary and capricious for three reasons.  First, CMS's conclusory statement of reasons for its decision is so vague as to be meaningless, does not show that CMS considered all relevant factors and record evidence, and utterly fails to justify the weighty decision to threaten Oswald's livelihood for three years.  Under the most generous interpretation of the CMS letters, CMS purportedly "found" that three consumers never consented to be enrolled in the health plans in which AHG enrolled them based on their statements to CMS investigators.  But CMS never explained, *inter alia*, what evidentiary standard it applied to make its finding; why it gave greater weight to the memories of three consumers regarding events from approximately one year ago than to the consumers' signed written acknowledgement and consent forms and other evidence supporting the authenticity of the consumer signatures on these forms; what questions were asked of the three consumers in their respective interviews with CMS— including whether they were confronted with their signed written acknowledgements and consent forms, denied their authenticity, and what else, if anything, they said about the forms—and what other statements the three consumers made to investigators; what evidence suggested to CMS that Oswald's Exchange User ID credentials were used for, or associated with, the enrollments; why CMS disregarded Oswald's statement in his sworn declaration that he did not interact with the consumers and the corroborating HealthSherpa documentation that showed that the consumers' interactions were with others who acted as the writing agents for the policies; what specific conduct CMS "found" Oswald engaged in that was fraudulent or abusive in a manner that may cause

imminent or ongoing consumer harm; and how that conduct was "sufficiently severe" to warrant termination.

43.     There is simply no evidence from which anyone could conclude that the consent forms are forgeries, that Oswald completed the eligibility applications with respect to the identified consumers, that Oswald entered inaccurate information on these applications, or that he enrolled the identified consumers without their consent as CMS concluded.  Instead, there is overwhelming evidence that Oswald did not interact with the identified consumers concerning the enrollments identified by CMS and that AHG personnel obtained signed written acknowledgement and consent forms from the consumers.  Oswald swore under oath in his Declaration that he did not interact with the identified consumers or have any direct involvement in the sale of the policies to them— and HealthSherpa's records corroborate his sworn statement.  Moreover, Oswald submitted the signed written acknowledgement and consent forms as well as signature.io records that establish that the five consumers identified by CMS received these forms, reviewed them, verified their mobile phone number, and signed the documents.

44.     In addition to CMS's failures, the regulation governing the suspension and termination process is vague in a manner that allows for—and even encourages—arbitrary and capricious decision-making such as that before this Court.  The failure of the regulation to set forth an evidentiary standard that must be used in making findings in the context of a termination, by itself, renders the regulation unlawful in this regard and creates a situation where "everything hangs on the fortuity of an individual official's decision."  *Judulang*, 565 U.S. at 58.

45.     Finally, CMS's failures to identify all of the evidence it considered in its decision-making, describe how it weighed this evidence, and explain the basis for its decision make clear that CMS failed to consider an important aspect of the problem here—that agents and brokers will

be disincentivized to participate in the ACA healthcare exchanges when they learn that CMS can and will terminate agents and brokers at a whim, without due process, and with little explanation. This will undermine the statutory intent to incentivize the enrollment of eligible consumers, *see NFIB v. Sebelius*, 567 U.S. 519 538 (2012), by making agents and brokers—a critical part of the enrollment system—less likely to participate in the ACA Exchanges.

**IV.    CMS's Termination of Oswald Violated the Due Process Clause of the Constitution.**

46.    Oswald and AHG have a property interest in their salary and business, respectively. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019) ("Individuals also have constitutionally-protected property interests in their wages."). Oswald has a property interest in his livelihood, which CMS is putting at risk without justification, and AHG gets commission payments from ACA enrollment applications submitted through the Exchanges under Oswald's NPN. To give this Court a sense of the amount of business affected by CMS's baseless termination, approximately 80,000 enrollment applications were submitted using Oswald's NPN and remained active as of July 2024, which generated more than $2 million in estimated commission payments in July alone. By terminating Oswald without sufficient evidentiary support and justification, and informing State insurance regulators of the termination and proposed ban for the next three years, CMS's action has put a black mark on Oswald's career, threatens to cause State regulators to revoke Oswald's licenses, which threatens his chosen livelihood and puts a massive amount of AHG's business at risk—since health plans may choose not to pay AHG based on the CMS termination or if Oswald's licenses are suspended.

47.    Requiring CMS to use a legitimate evidentiary standard in assessing the evidence it obtains with respect to a potential termination and demanding that they explain and justify their decisions in a clear and fulsome manner constitutes a "substitute" procedure that would add no

real administrative or fiscal burden to the agency—and would inject fundamental fairness into the termination process. Without this requirement, the risk of an erroneous deprivation of property is extremely high, as evidenced by the facts surrounding Oswald's termination. CMS is depriving the Plaintiffs of property interests and the *Eldridge* factors point to one inescapable conclusion—that CMS's termination of Oswald violated the Due Process Clause.

## V.      CMS's Decision Threatens Irreparable Harm to Plaintiffs

48.     Plaintiffs face serious harms that are irreparable, including but not limited to financial harms for which the Plaintiffs have no recourse because of the government's sovereign immunity. *See Odebrecht Const., Inc. v. Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (stating that "the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."). CMS's termination of Oswald's Exchange agreements—and the fact that it has effectively banned him from the ACA system for three years—has harmed Oswald's reputation, puts his State licenses in immediate jeopardy, and threatens to deprive Oswald of his ability to pursue his chosen livelihood. The termination also has likely reduced AHG's commission revenue and put a significant portion of the revenue generated by enrollments tied to Oswald's NPN number at risk. Additionally, it will ultimately harm consumers, who may not get the benefit of the historical knowledge of the consumer's circumstances that AHG brings to the table when assessing whether to keep a consumer in an existing plan or change plans. These harms are immediate, continuing, and irreparable.

49.     CMS's termination of Oswald's Exchange agreements without a legitimate finding of wrongdoing based on a recognized evidentiary standard or fulsome disclosure of the evidence CMS considered in the matter unjustly harms his professional reputation, puts his State licenses at risk of revocation, and threatens to deprive him of substantial income. The termination could not

have happened at a worse time for Oswald—this is the Annual Enrollment Period ("AEP"), which is the busiest time of the year for the industry. Additionally, CMS's communication of the termination to State insurance departments and regulators will likely initiate a tsunami of license terminations by State regulators in response to CMS's decision. The termination also will remain with Oswald in the future, representing an unfair black mark on his professional life that will make it harder for him to gain other employment in the industry. Such severe, irreversible consequences should only be meted out after due process and a full and fair hearing of the evidence.

50.     The termination and three-year ban also have struck a punishing blow to AHG, which as of July was generating over $2 million in commission-based revenue from approximately 80,000 enrollments tied to Oswald's NPN that remained active. As of October 2024, the commission revenue amount has decreased to approximately $1.7 million from the approximately 70,000 enrollments tied to Oswald's NPN that remained active in October—and there is an expectation that, in addition to normal policy turnover, Oswald's termination will cause a further decrease in commission revenue as it will be harder to retain many of these enrollees as a result of CMS's recent procedural changes. Specifically, in July 2024 CMS instituted changes that make it much harder—and more time consuming—for unassociated or "new" agents and brokers to assist consumers in making plan changes or enrolling in new health plans. *See* July 19, 2024, CMS Statement on System Changes to Stop Unauthorized Agent and Broker Marketplace Activity, https://www.cms.gov/newsroom/press-releases/cms-statement-system-changes-stop-unauthorized-agent-and-broker-marketplace-activity (last visited on Nov. 14, 2024); see also Oct. 17, 2024, CMS Update on Actions to Prevent Unauthorized Agent and Broker Marketplace Activity, https://www.cms.gov/newsroom/press-releases/cms-update-actions-prevent-unauthorized-agent-and-broker-marketplace-activity (last visited on Nov. 14, 2024). These changes include a

requirement that unassociated or "new" agents or brokers "will be required to conduct a three-way call with the consumer and the Marketplace Call Center or to direct the consumer to submit [plan or enrollment changes] themselves through HealthCare.gov or via an approved Classic Direct Enrollment or Enhanced Direct Enrollment partner website with a consumer pathway."  July 19, 2024, CMS Statement on System Changes to Stop Unauthorized Agent and Broker Marketplace Activity.  Because of the sheer volume of enrollments associated with Oswald's NPN—each "new" AHG agent of record will need to go through this cumbersome process—a fact that will ensure more lost enrollments and related commission revenue.  Additionally, the termination, in conjunction with the new CMS procedures for unassociated or "new" agents and brokers, will make it more difficult for AHG to provide sufficient service to consumers who rely on it to use its historical knowledge of their particular needs to match them with plans that fit them.  Such harms require immediate relief, particularly during the busiest time in the industry's year.

**VI.      The Harms to the Plaintiffs Outweigh Any Harm to CMS and the Relief Sought is Not Contrary to the Public Interest**

51.      The harm to Oswald's reputation, State licenses, and chosen livelihood; AHG's realized and potential financial losses in the tens of millions of dollars over the next year; and AHG's ability to provide effective service to the affected consumers far outweigh any harm to CMS with respect to the equitable relief sought by Plaintiffs.  The severity of the harms to the Plaintiffs from CMS's unlawful actions are set forth above.  The only effect an injunction would have on CMS is that it would require the agency to follow the law—and develop a process and procedures for terminations that are transparent, provide an accused with a fair opportunity to respond to CMS allegations, and have a recognized standard for assessing evidence and making the required findings.  In other words, CMS would merely have to comply with its own regulations, the law, and due process, which they should be doing absent a court order.

52.     Moreover, the Plaintiffs' requested relief is not contrary to the public interest. While CMS might argue that the requested equitable relief will threaten harm to its oversight and enforcement authority and to consumers in the ACA market, as explained above, its cursory, standardless adjudication process invites arbitrary and capricious decision-making, violates due process, and failed to establish that Oswald engaged in the conduct alleged.  In fact, Oswald submitted overwhelming evidence that showed that he did not engage in fraud or abusive conduct. Preventing an unjust termination and incentivizing CMS to create a process that comports with due process is surely in the public interest—and no other public interest in this matter outweighs it.

### CLAIMS FOR RELIEF

### <u>COUNT I</u>
**Oswald's Termination Violates the Administrative Procedure Act
Because It Is Unwarranted By the Facts**

53.     Plaintiffs repeat and incorporate by reference Paragraphs 1 through 46.

54.     A court reviewing agency action is to engage in a *de novo* review of the action and set it aside if it was "unwarranted by the facts."  5 U.S.C. § 706(2)(F); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971).

55.     Under Section 706(2)(F), "de novo review of whether the [Administration's decisions] were 'unwarranted by the facts' is authorized … in only two limited circumstances': (1) 'when the action is adjudicatory in nature and the agency factfinding procedures are inadequate' and (2) 'when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.'" *Bajjani v. U.S. Small Business Admin.*, 824 Fed. App'x 725, 735 (11th Cir. Aug. 13, 2020) (quoting *Overton Park*, 401 U.S. at 415).

56.     With respect to the first circumstance, "*[d]e novo* review is appropriate only where the underlying [factfinding] procedures are inadequate to the extent that they are deemed 'severely defective.'" *OKKO Business PE v. Lew*, 133 F. Supp.3d 17, 28 (D. D.C. 2015).

57.     Defendants did not disclose to Oswald significant evidence against him, failed to consider evidence he submitted well in advance of CMS's final determination, and did not apply a recognized evidentiary standard to its assessment of the evidence with respect to Oswald's termination.

58.     As a result, CMS's factfinding procedures with respect to Oswald's termination are severely defective such that the termination was unwarranted by the facts and this matter requires *de novo* review by this Court.

<u>**COUNT II**</u>
**Oswald's Termination Violates the Administrative Procedure Act**
**Because It Violates HHS Regulations**

59.     Plaintiffs repeat and incorporate by reference Paragraphs 1 through 46.

60.     The APA provides that courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

61.     An agency "is not free to ignore or violate its regulations while they remain in effect." *Elevance Health, Inc. v. Becerra*, No. 23-CV-3902 (RM), 2024 WL 2880415, at *9 (D. D.C. June 7, 2024) (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)).

62.     Defendants have not complied with the regulations that might provide for suspension and termination of an agent's or broker's Exchange agreements.

63.     As a result, Oswald's termination violates HHS's own regulations, is not in accordance with the law, and is without observance of procedure required by law.

**COUNT III**
**Oswald's Termination Violate the Administrative Procedure Act**
**Because It is Arbitrary and Capricious**

64.     Plaintiffs repeat and incorporate by reference Paragraphs 1 through 46.

65.     The APA requires that a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution.  5 U.S.C. § 706(2)(A).

66.     An agency decision is "arbitrary and capricious" if "the factors the agency relied on are not what Congress intended, if the agency 'entirely failed to consider an important aspect of the problem,' if the agency offered an explanation [for its decision that runs] counter to the evidence before the agency, or if the agency action 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State of Florida v. Dept. of Health and Human Svs.*, 19 F.4th 1271, 1290 (11th Cir. 2021) (internal citations omitted); *see also Georgia v. Brooks-LaSure*, No. 24-cv-16, 2024 WL 3416278, *5 (S.D. Ga. July 15, 2024).

67.     The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  Additionally, a court "must reverse an agency policy when [it] cannot discern a reason for it." *Judulang v. Holder*, 565 U.S. 42, 64 (2011).

68.     Agency action is lawful only if it is based on "reasoned decisionmaking", which means that the action is based on a "'consideration of the relevant factors'" and "important aspect[s] of the problem." *Michigan v. E.P.A.*, 576 U.S. 743, 750-52 (2015).

69.     Agencies must "examine all relevant factors and record evidence", *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017), and cannot "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

70.     Oswald's termination is arbitrary and capricious for three reasons.

71.     First, CMS's conclusory statement of reasons for its decision is so vague as to be meaningless, does not show that CMS considered all relevant factors and record evidence, and utterly fails to justify its decision.  Such a decision is arbitrary and capricious and is prohibited by the APA.

72.     Second, the regulation governing the suspension and termination process is vague in a manner that allows for—and even encourages—arbitrary and capricious decision-making.  The failure of the regulation to set forth an evidentiary standard that must be used in making findings in the context of a termination, by itself, renders the regulation unlawful in this regard and creates a situation where "everything hangs on the fortuity of an individual official's decision." *Judulang*, 565 U.S. at 58.

73.     CMS's failures to identify the evidence it considered in its decision-making, describe how it weighed this evidence, and explain the basis for its decision make clear that CMS failed to consider an important aspect of the problem here—that agents and brokers will be disincentivized to participate in the ACA healthcare exchanges when they learn that CMS can and will terminate agents and brokers at a whim, without due process, and with little explanation.  This will undermine the statutory intent to incentivize the enrollment of eligible consumers by making agents and brokers—a critical part of the enrollment system—less likely to participate in the ACA.

**<u>COUNT IV</u>**
**Oswald's Termination Violate the Due Process Clause of the Constitution**

74.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 46.

28

75.     The Constitution of the United States provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. V.

76.     Plaintiffs have a property interest in their business and careers.

77.     By preventing Plaintiffs from enrolling consumers in ACA plans, Defendants threaten to deprive Plaintiffs of their property interests.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1.     Declaring, under 28 U.S.C. § 2201, that Defendants' decision to terminate Oswald's FFE Agreements was unwarranted by the facts in violation of the APA;

2.     Declaring, under 28 U.S.C. § 2201, that Defendants' decision to terminate Oswald's FFE Agreements violates HHS regulations and is thus unlawful under the APA;

3.     Declaring, under 28 U.S.C. § 2201, that Defendants' decision to terminate Oswald's FFE Agreements is arbitrary and capricious and thus unlawful under the APA;

4.     Declaring that the termination of Oswald's FFE Agreements violates the Due Process Clause of the Fifth Amendment to the United States Constitution;

5.     Preliminarily and permanently enjoining and setting aside the final determination terminating Oswald's FFE Agreements, without bond;

6.     Preliminarily and permanently enjoining and setting aside the suspension and termination of Oswald's right to enroll or change enrollments of consumers in ACA plans through the FFE;

7.     Preliminarily and permanently enjoining and setting aside CMS's proposed denial of Oswald's right to enter into Exchange agreements for three years from the date of the termination letter;

8.      Preliminarily and permanently enjoining CMS from communicating Oswald's suspension and termination to State insurance regulators; and

9.      Granting all other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated: November 18, 2024                          Respectfully submitted,

                                                   */s/*      Maia Sevilla-Sharon, Esq.

                                                  Maia Sevilla-Sharon, Esq.
    1395 Brickell Avenue, Ste. 900
    Miami, FL  33131
    Tel.:  305-200-8800
    Email:  Maia.Sevilla-Sharon@lockelord.com

    Ryan M. DiSantis, Esq. *Pro Hac Vice Forthcoming*
    111 Huntington Avenue, 9th Fl.
    Boston, MA  02199-7613
    Tel.:  617-239-0100
    Email:  Ryan.DiSantis@lockelord.com

    Matthew T. Furton, Esq. *Pro Hac Vice Forthcoming*
    Brandon Calderon, Esq. *Pro Hac Vice Forthcoming*
    111 South Wacker Drive, Ste. 4100
    Chicago, IL  60606
    Tel.:  312-443-0445
    Email:  MFurton@lockelord.com
    Email:  Brandon.Calderon@lockelord.com

    *Counsel for Plaintiffs*